# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 3841 | **DATE** | 11/12/2003 |
| **CASE TITLE** | Jurlean Market Vs. SBC Ameritech | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and Order entered. Defendant Ameritech's Motion for Summary Judgment [#27] is **granted in part and denied in part.** Defendant Ameritech's Motion to Strike [#34] is **granted in part and denied in part.** Status hearing set for **11/21/03 at 9:00 a.m.** AK

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | 2 |
| | Notified counsel by telephone. | NOV 1 3 2003 |
| | Docketing to mail notices. | date docketed |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | 11/12/2003 |
| FT/ *perry* | courtroom deputy's initials | date mailed notice |

Document Number

41

U.S. DISTRICT COURT
CLERK
03 NOV 12 AM 2:27
FILED FOR ENTRY
Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

NOV 1 9 2003

JURLEAN MARKET,                    )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )     Case No.: 01 C 3841
                                   )
ILLINOIS BELL TELEPHONE COMPANY,   )     Magistrate Judge
d/b/a AMERITECH ILLINOIS, ROBERT   )     Arlander Keys
CZERWINSKI, and TIM LASIEWICZ,     )
                                   )
          Defendants.              )

## MEMORANDUM OPINION AND ORDER

Jurlean Market, who is African-American, sued her former employer, Ameritech Illinois, and two of her former supervisors, Robert Czerwinski and Tim Lasiewicz, alleging race discrimination and retaliation. On July 19, 2001, the district judge to whom the case was originally assigned dismissed the claims against Czerwinski and Lasiewicz, leaving Ameritech as the only defendant. Shortly thereafter, the parties consented to proceed before a magistrate judge, and, on October 12, 2001, the case was reassigned to this Court. It is presently before the Court on Ameritech's motion for summary judgment.

## FACTS & PROCEDURAL HISTORY

Jurlean Market began working for Ameritech in 1974. In 1995, Market transferred to Ameritech's high capacity digital center; that center, commonly referred to as the "Hi-Cap Center," handled a high volume of calls and services relating to

41

particular types of circuits (those designated DS-1 and above).
Market started at the Hi-Cap Center as a "Technical Associate"
and then, in 1998, became a "Maintenance Administrator" in the
provisioning group, which managed the "turn up and testing
processes of new orders." Maintenance Administrators screened
and answered incoming calls from customers, updated the
computerized note screens that provided technicians with customer
information, and performed work on Wired Office Tests, which
showed when an order should be wired in a central office. The
Maintenance Administrator position was a non-management union
position, governed by a collective bargaining agreement. Market
worked the first shift at the Hi-Cap Center, from 8:30 a.m. to
4:30 p.m., along with more than 100 other employees, at least
half of whom were African-American.

When Market started at the Hi-Cap Center, the job of
screening incoming calls was not part of the Maintenance
Administrators' job description; rather, that job fell to
Telecommunications Specialists, who, on the union hierarchy, were
a step above the Maintenance Administrators. In 1998, however,
union and management negotiated to downgrade the screening
responsibilities so that the Maintenance Administrators could
perform this function. At some point in the summer of 2000,
while Market was away from work on leave, management decided to
automate the screening function and to give the function back to

the Telecommunications Specialists. Neither the initial reassignment, nor the subsequent reassignment, affected Market's base pay.

During Market's tenure at the Hi-Cap Center, the atmosphere was often tense, and employee morale was often low, though the parties dispute the cause of the tension and low morale. The record shows that offensive and derogatory language – some of which was unambiguously racial – was not uncommon. For example, according to Market, one of the employees at the center, Joe Fricilone, frequently referred to his African-American co-workers as "niggers" or "dumb niggers"; Fricilone directed this slur at Market on one occasion, and he called her a "black bitch" "numerous, numerous times." Additionally, according to Market, one of the supervisors in the Hi-Cap Center, Robert Czerwinski, referred to his male subordinates as "crackheads," and Czerwinski and Tim Lasiewicz, another supervisor, called Market a "bitch" and a "black bitch" on an almost daily basis for a period of several months in mid to late 2000.

Market and Czerwinski had a terrible rapport. Market viewed Czerwinski as someone who felt he was above the rules; she repeatedly accused him of failing to follow the collective bargaining agreement between the union and the company, choosing instead to run the Hi-Cap Center as he saw fit, and often making decisions on the basis of favoritism, instead of seniority or

other criteria spelled out in the CBA. He, in turn, seemed to view her as a huge pain in his neck. No doubt contributing to the animosity between Czerwinski and Market was the fact that, from March 1999 to October 2001, Market served as a union steward. In that capacity, she filed grievances on behalf of her co-workers and on her own behalf. By her own account, Market was a zealous union advocate, filing more grievances than the other union stewards. In her first two months on the job, Market filed more than 100 grievances; from August 2000 to March 2001, she filed 200 to 300 grievances. And she filed more than 50 grievances on her own behalf. She solicited grievances and encouraged her co-workers to file grievances against the company. She continually stirred the pot, and she participated in (and possibly even initiated) a campaign to have Czerwinski fired. It is not surprising that the two could not get along.

In addition to her many grievances, on September 1, 2000, Market filed a charge of discrimination with the EEOC. Shortly thereafter, she met with Ameritech's internal EEO officer, James Hsu, and, following that meeting, the company removed Czerwinski as Market's supervisor; beginning in October of 2000, Market reported to Avery Owen. At some point thereafter – there is a dispute as to whether it was November 2000 or March 2001 – Czerwinski left the Hi-Cap Center altogether. Market filed a second charge with the EEOC on January 11, 2001. She received

4

right-to-sue letters from the EEOC on both charges on about April 30, 2001, and, on May 24, 2001, she sued, alleging race discrimination and retaliation. Shortly before her deposition in this case, Market applied to participate in a voluntary early retirement program offered by the company; the company determined that she was eligible for the program, and, through that voluntary retirement program, Market left the company on June 22, 2002. Prior to retiring, Market had been absent from work for several extended periods. She took a leave of absence from June 29, 2000 to August 2, 2000; then she took another leave of absence from March of 2001 to October of 2001; she took more time off in November and December of 2001, and then, after returning for a short period of time, took off from January of 2002 until the time she retired.

Although the Court is aware that Market filed charges with the EEOC, the exact nature of those charges remains a mystery. Market has never filed copies with the Court; she failed to attach them to her complaint and they are not otherwise a part of the record. Thus, the Court is left to rely upon Market's characterization of the charges.[1] In her complaint, Market alleges that the EEOC charges focused on the actions of her superiors, Czerwinski and Lasiewicz, who she claims created a

---

[1]Ameritech has never challenged the suit on the basis that the allegations are beyond the scope of the EEOC charges, and so the Court assumes that the allegations are properly before it.

hostile working environment and denied her overtime. Complaint, ¶¶8-9. She further alleges in her complaint that: (1) Czerwinski "re-assigned work so that African-Americans received a disproportionate share of the work"; (2) on numerous occasions, both Czerwinski and Lasiewicz referred to Market as a "bitch"; (3) on numerous occasions, both referred to African-American men as "crackheads"; and (4) both repeatedly allowed and encouraged other employees to refer to African-American women as "black bitches" and to refer to African-Americans as "niggers." Complaint, ¶¶13, 15-17. Market also alleges that the defendants tried to interfere with her union steward duties, telling other employees not to file complaints with her, and harassing those employees who did file complaints with her. *Id.* ¶¶21-22. Finally, she alleges that, in addition to being denied overtime, she was denied job training that was permitted to similarly-situated white employees, and that she was denied equal work conditions as similarly-situated white employees. *Id.* ¶¶24-26. Market also alleges that the defendants retaliated against her because she complained about the discriminatory treatment; specifically, she alleges that the company denied her medical benefits because she filed an EEOC complaint. Complaint, ¶¶34-37.

At her deposition, Market further clarified her allegations: she stated that her discrimination allegations were based upon

her managers calling her a "bitch" and a "black bitch," and based upon Fricilone's persistent use of racial epithets. *See* Deposition of Jurlean Market, pp. 517-26. She explained that her retaliation allegations were based upon the company stripping her of her screening responsibilities, denying her the opportunity to work overtime, interfering with her union steward responsibilities and denying her claim for leave benefits. *See* Market Deposition, pp. 527-61.

Ameritech has moved for summary judgment on Market's complaint, arguing that, even if the Court assumes that all of her allegations are true, Market still cannot make out a prima facie case of race discrimination and retaliation under Title VII. Market, of course, disagrees, and, to support her opposition to the motion, she submitted a 57-page affidavit. Ameritech has moved to strike the affidavit, and the Court considers that motion, as well as the motion for summary judgment, below.

## DISCUSSION

A.  Summary Judgment Standards

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also*

7

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive summary judgment, the non-moving party must offer more than "mere conclusory" allegations. *Nowak v. St. Rita High School*, 142 F.3d 999, 1002 (7th Cir. 1998) *See also Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The non-moving party must offer more than a "metaphysical doubt as to the material facts."). The non-moving party will not survive summary judgment if it cannot present sufficient evidence to support each element of its case on which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, the Court will disregard all facts not properly supported by the record. *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997).

B. <u>Ameritech's Motion to Strike</u>

Speaking of facts not properly supported by the record, Ameritech has moved to strike the affidavit Market submitted in support of her response to Ameritech's Rule 56.1 Statement of Facts. "It is by now well-settled that a party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute through the submission of an affidavit that contradicts prior deposition testimony." *Amadio v. Ford Motor*

8

*Company*, 238 F.3d 919, 926 (7th Cir. 2001). "Consequently, '[w]here a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.'" *Id.* (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995).

Many of the statements in Market's affidavit directly contradict her earlier deposition testimony. For example, in paragraphs 6 and 32 of her affidavit, she states that she did not solicit grievances. Yet, at her deposition, when she was asked whether she solicited grievances, she said "of course." Market Deposition, p. 382. In paragraph 20 of her affidavit, Market disagrees with Ameritech's statement that Czerwinski was abrasive to all women, regardless of race. Yet, at her deposition, she admitted that that was the case. *See* Market Deposition, pp. 430-31. She also states, in paragraph 20 of her affidavit, that Czerwinski called her a "nigger bitch," in addition to calling her a "bitch" and a "black bitch." She repeats this allegation in paragraph 39 of her affidavit. Yet, at her deposition, she claimed only that Czerwinski called her a "bitch" and a "black bitch"; she never mentioned that Czerwinski called her a "nigger bitch." Her attempt to add this inflammatory epithet to the

litany of atrocities allegedly inflicted by Czerwinski appears to be a transparent attempt to bolster her case with fabricated evidence. If it were true, Market would have mentioned it at her deposition.

Similarly, in paragraph ¶36 of her affidavit, Market states that she never told Tom Brocious that Czerwinski had called her a black bitch. Yet, at her deposition, Market specifically stated that she had "complained to Tom Brocious that it [Czerwinski and Lasiewicz calling her a "bitch" and a "black bitch"] was happening" and that she "told Tom [Brocious] that they were doing that, and continually told Tom about that . . . ." Market Deposition, pp. 460-63. In paragraph 37 of her affidavit, Market states that the anonymous petition to get Czerwinski fired specifically alleged racial discrimination and specifically mentioned Joe Fricilone's use of the word "nigger." Yet, at her deposition, Market admitted that the anonymous letter had nothing to do with racial discrimination. *See* Market Dep., p. 491. And even more importantly, the letter itself contradicts her affidavit and is consistent with her deposition testimony. In paragraphs 38 through 44, Market describes her conversations with James Hsu, the internal EEO manager, in much greater detail than she was able to provide at her deposition, taken more than a year earlier. *See* Market Deposition, p. 499. Again, without some explanation as to why Market was suddenly able to remember so

10

much more about her conversations, the affidavit appears to be false, an attempt to patch up her deposition testimony.

In numerous other instances, Market is simply argumentative, purporting to deny the statement, but offering a response that does not deny or contradict the statement. For example, in paragraph 51 of her affidavit, Market states that "Lucinda Williams did not testify that she overheard Joe Fricilone say 'dumb nigger' once. I was present when Lucinda Williams testified and she said she herself heard Fricilone say 'dumb nigger' while walking with me." First, the second sentence does not support the first sentence; the statement does not really contradict the substance of Ameritech's statement of fact, but is simply argumentative. Second, Williams' testimony was recorded in a transcript, which shows that, in fact, Williams testified that she heard Fricilone say "dumb niggers" only one time. Williams Dep., p. 143. Market cannot change that testimony by denying – or purporting to deny – its existence. These types of responses violate the letter and spirit of Local Rule 56.1, and make the Court's work much more difficult, because they require the Court to parse through the record to determine whether there is actually a valid basis for denial, or whether, despite Market's argumentative spin, she should be deemed to have admitted the statement.

Market's affidavit also contains unsupported conclusory

assertions.  Rule 56(e) of the Federal Rules of Civil Procedure
requires that affidavits offered in opposition to summary
judgment "be made on personal knowledge, ... set[ting] forth such
facts as would be admissible in evidence, and ... show[ing]
affirmatively that the affiant is competent to testify to the
matters stated therein."  "Although 'personal knowledge' may
include inferences and opinions, those inferences must be
substantiated by specific facts." *Drake v. Minnesota Mining &
Manufacturing Co.*, 134 F.3d 878, 887 (7th Cir. 1998)(quoting
*Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir. 1988)).  In
many instances, that is not the case with Market's affidavit.
For example, in paragraph 5 of her affidavit, Market states that
the tension and stress at the Hi-Cap Center "was not due to the
workload but due to Czerwinski's foul mouth and the hostile work
environment he created and encouraged."  In paragraph 8 of her
affidavit, she states that "[d]enial of overtime was used by
Robert Czerwinski and Tim Lasiewicz to control and punish African
Americans and any person lodging complaints about [their]
overtime selection process."  In paragraph 21 of her affidavit,
Market states that "Czerwinski was not straightforward.  He was a
liar and a racist."  In paragraph 47, Market states that she was
"denied a promotion to the higher wage group because Czerwinski,
Hsu, Brocious, and Hager lied about the reassignment of the
screener's job to a higher wage title.  Under the Collective

12

Bargaining Agreement I would have been promoted." In paragraph 69, Market states that she "was denied overtime because my supervisors, Robert Czerwinski and Tim Lasiewicz, harboured racial prejudices toward me as a black female that they . . . acted upon in the workplace." *Id.*, ¶67. These are exactly the type of conclusory allegations that Rule 56 counsels should be disregarded on summary judgment. "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Hadley v. County of Du Page*, 715 F.2d 1238, 1243 (7th Cir. 1983). Market's affidavit is short on concrete facts.

For the same reason, the Court will disregard statements such as "Burton can not possibl[y] be a witness to what I would have a tendency accuse every manage of making racist decisions," Market Affidavit, ¶31; "[t]here is no way management or craft workers could be aware of whether I did or did not get along with Czerwinski," *id.*, ¶34; "no one can judge a person's personality trait in one or two hours and one or two phone conversations," *id.*, ¶43; "I was a trained union steward with 28 years of service surely Hsu knows I would not have [threatened] an individual's life," *id.*, ¶44; "[Paulette] McWaters would not have received any complaints from subordinates, including me (Plaintiff) because

13

McWaters was not involved in the work assignments," *id.*, ¶58; "the following witnesses cannot verify or deny any racially or sexually offensive language was used in the workplace," *id.*, ¶62; "[t]here is no way [Priscilla] Davis could have observed anyone's conduct in the workplace," *id.*, ¶65; and "Jim Kassing, my union business representative, cannot possibly be aware of any facts that would support a claim that I was denied overtime because of my race," *id.*, ¶71.

Finally, many of the statements in Market's affidavit are based on impermissible hearsay. Examples of such statements include the following: "[Darlene] Tunstall told me that the decisions about overtime which were being grieved were not her (Tunstall's) decisions," Market Affidavit, ¶9; "Rene McMullen [a Telecommunications Specialist supervisor] expressed concerns to me as a union steward that [Marie] Gorski had delayed the screens job duties in order to gain overtime," *id.*, ¶12; and "Dr. Koenig, my psychiatrist, informed me to hold my discussions regarding work-related issues with my therapist," *id.*, ¶68.

The Court strikes paragraphs 5-6, 16, 20-24, 29-31, 33, 36-44, 51-54, and 67, and parts of paragraphs 8, 9, 12, 47, 58, 62, 65, and 68. The Court will not rely upon the statements made in these paragraphs, but will, where applicable, rely upon the more reliable evidence in the record, including the transcript from Market's earlier deposition and the transcripts of other

witnesses' depositions.

C.   Market's Title VII Claims

Ameritech asks the Court to award summary judgment in its
favor on Market's race discrimination claim, her retaliation
claim, and her hostile environment claim.

1.   Market's Race Discrimination Claim

Market may prove her race discrimination claim either by
providing direct evidence of discrimination or by proceeding
under the indirect, burden-shifting method of *McDonnell Douglas
Corp. v. Green*, 411 U.S. 792 (1973).  Market argues that she has
both direct and indirect proof of her claim.  The Court quickly
rejects her argument with respect to the former.  Direct
evidence, the "smoking gun" type of evidence, is hard to come by.
Allegedly discriminatory remarks, which is what Market relies on
to support her claim, qualify as direct evidence only "if they
are 'related to the [adverse] employment decision in question."
*Oest v. Illinois Department of Corrections*, 240 F.3d 605, 611
(7th Cir. 2001).  And it is the rare employer who will so
blatantly link its racial animus to a decision to fire or
discipline an employee.

Here, Market would have to show that the persistent barrage
of name-calling was related to the adverse employment decisions
she alleges - namely the denial of overtime and training
opportunities and her alleged constructive discharge in June

15

2002.  And she has not done so.  Market alleges that she suffered
an adverse employment action in that she was stripped of her
screening responsibilities, she was denied the opportunity to
work overtime, and she was constructively discharged by being
forced to accept voluntary retirement.  But she has offered no
evidence linking the alleged denial of overtime or training to
the alleged slurs, and the alleged constructive discharge, which
occurred more than a year after the name-calling would have
stopped, is temporally too remote to qualify as direct evidence.
See Oest, 240 F.3d at 611-12.  Accordingly, the Court finds that
Market cannot sustain a charge of discrimination under the direct
method, and turns, therefore, to the indirect method spelled out
in McDonnell Douglas.

Under McDonnell Douglas, Market must first establish a prima
facie case of discrimination; if she succeeds, Ameritech then has
a chance to offer a non-discriminatory reason for any adverse
employment action Market suffered; and if Ameritech does so,
Market must then submit evidence that Ameritech's explanation is
simply a pretext for discrimination.  See McDonnell Douglas, 411
U.S. at 802; Oest, 240 F.3d at 612 (citations omitted).
Ameritech argues that Market falls short on the prima facie case.

To establish a prima facie case for race discrimination, in
violation of Title VII, Market must show that: (1) she belongs to
a protected class; (2) she was performing her job at Ameritech to

the company's satisfaction; (3) she suffered an adverse employment action; and (4) a similarly-situated employee who was not a member of a protected class was treated more favorably by Ameritech. *See Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 897 (7th Cir. 2003) (citing *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir. 1999). Ameritech argues that Market's claim fails on the third and fourth elements; it argues that she cannot show that she suffered an adverse employment action, and that she cannot show that similarly-situated employees were treated more favorably.

Although the Seventh Circuit has defined "adverse employment action" broadly, "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996). To be actionable, adverse actions must be "materially adverse" and "more than a 'mere inconvenience or an alteration of job responsibilities.'" *Oest*, 240 F.3d at 612 (quoting *Crady v. Liberty National Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Examples of actions that qualify as "adverse" include termination of employment, demotion evidenced by a decrease in wages or salary or a less prestigious title, a material loss of benefits, significantly diminished material responsibilities or other incidences that might be unique to a particular situation. *Id.*

Market was neither fired, nor demoted; nor did she suffer

any loss of salary or benefits. Market's tenure at Ameritech ended on June 22, 2002, when she accepted a voluntary retirement package being offered by the company as part of a company-wide effort to reduce headcount. Her arguments on the adverse employment action element are based on the alleged denial of overtime and the reassignment of screening responsibilities. She also argues that, although she retired as part of a voluntary retirement program, she was actually constructively discharged from the company.

The reassignment of screening duties does not amount to an adverse employment action. Importantly, when Market became a Maintenance Administrator, screening was not part of the job; that function was performed by Telecommunication Specialists. The company transferred the function to Maintenance Administrators in 1998, and then decided to transfer the function back to Telecommunication Specialists in 2000. Although it is true that "a dramatic downward shift in skill level required to perform job responsibilities can rise to the level of an adverse employment action," *Smart*, 89 F.3d at 441, there is no evidence that the reassignment of the screening function in any way affected the skill level required to perform the Maintenance Administrator job. The Court has no basis to conclude, for example, that the move gutted the job or stripped Market of the plum or most prestigious aspects of her job title.

18

Market's claim that she was denied overtime could plausibly satisfy the adverse employment action element of her prima facie case, because the denial of overtime would affect Market's overall pay, even if it would not affect her salary. Unfortunately, the claim is not supported in the record. First, Market has made no effort to demonstrate the extent of any financial loss she would have suffered as a result of the alleged overtime denial, and the Court has no basis to evaluate whether any such loss would be significant enough to constitute a "materially" adverse action. Significantly, Sue Valena, one of the other Maintenance Administrators Market alleges got the overtime work that she should have been permitted to work, worked only 3 hours of overtime during the relevant period. The Court would be hard pressed to find that the loss of only 3 hours of pay constitutes a materially adverse employment action. *See, e.g., Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (suggesting that a minor effect on non-salary type income would not amount to an adverse employment action, especially where the diminution in income was not effected because of a disciplinary matter). The fact that Market was off work for most of 2001, *see* Market Deposition, pp. 46-47, further suggests that Market would have been unlikely to accrue much in the way of overtime, even in the absence of any alleged discrimination.

Nor do the facts established in the record jibe with Market's allegations. Market alleges that, after she returned from her first leave of absence in August of 2000, Czerwinski denied her the opportunity to work any overtime. Yet she admitted at her deposition that she had, in fact, worked overtime in August and September of 2000. Market Deposition, pp. 348-49. She also admitted at her deposition that, by October of 2000, Czerwinski was no longer her supervisor, *id.* at pp. 504-05, which suggests that, after that time, he had little if any say over her ability to work overtime. Thus, to the extent Market has pinned her allegations concerning overtime to Czerwinski, the allegations would fail. Accordingly, the Court finds that Market has not demonstrated an adverse employment action based upon the denial of overtime.

Market's constructive discharge claim similarly fails. "Constructive discharge, like active discharge, is a materially adverse employment action." *EEOC v. University of Chicago Hospitals*, 276 F.3d 326, 331 (7th Cir. 2002) (citing *Fitzgerald v. Henderson*, 251 F.3d 345, 357-58 (2d Cir. 2001)). "But to demonstrate constructive discharge, the plaintiff must show that she was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable." *Id.* (citing *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998)).

Market argues that her work environment was so hostile that she was forced to accept voluntary retirement to preserve her mental health. And there is actually some support for this allegation in the record. In the affidavit Market submitted in opposition to Ameritech's Statement of Undisputed Facts, Market alleges that her decision to retire was not voluntary, and that she was forced to seek and accept the early retirement package because she could no longer endure the hellish environment at the Hi-Cap Center. Market Affidavit, ¶¶83-84. She specifically states in her affidavit that she felt forced out by the emotional distress intentionally heaped upon her by Czerwinski and Lasiewicz on an almost daily basis. *Id.*, ¶84. Strictly speaking, this testimony does not contradict what she said at her deposition. Although she stated at her deposition that the retirement option was "strictly voluntary," Market Dep., pp. 56-57, that is not entirely inconsistent with her later-added claim that her decision to seek that "option" was based on her sense that if she did not leave, the allegedly hostile work environment would send her over the edge. And she also said at her deposition that she felt that she "had to retire early." *Id.* at p. 585. Additionally, Market's allegation is buttressed to some extent by the deposition testimony of Dr. Richard Koenig, a psychiatrist who treated Market for what he diagnosed as a depressive disorder from May 7, 2001 to February 11, 2003. When

asked about Market's retirement, Dr. Koenig indicated that, in his view, Market had decided to retire because she realized that "it was easier and better for her to do that than to continue the fight." Deposition of Dr. Richard Koenig, p. 70. Read in context, the "fight" Dr. Koenig was referring to likely had nothing to do with racial issues and everything to do with union issues.

But there is actually a bigger problem with Market's constructive discharge allegation: the alleged constructive discharge occurred at least a year, and possibly as long as eighteen months, after the alleged harassing behavior ceased. The record shows that Czerwinski ceased being Market's supervisor in October 2000, and that he left the Hi-Cap Center in November 2000. Market's affidavit attempts to establish that Czerwinski did not leave the center until March of 2001. But even if the Court accepts that story, that still means that Czerwinski was gone from Market's life for more than one full year before Market elected to pursue the voluntary retirement option. And the record contains no evidence suggesting that Czerwinski's harassment continued after he left the Hi-Cap Center. Nor is there evidence demonstrating any name-calling or harassment from other employees after that date; Market's grievances and the behavior challenged therein all cover the period before Czerwinski left Hi-Cap. And the Court has no reason to doubt

that the harassment that allegedly forced Market out of her job would have stopped after Czerwinski left.  Based on this record, no reasonable jury could find that Market's decision to retire in June of 2002 amounted to a constructive discharge because of behavior that occurred at least a year earlier.

In addition to challenging Market's ability to demonstrate the third element of her prima facie case, Ameritech argues that Market is unable to demonstrate the fourth element; it argues that she cannot show that the company treated any similarly-situated white employee more favorably.  Market's argument on this element of the prima facie case is neither weighty nor elucidating.  Her argument, in its entirety, is that "[t]he record is replete with evidence of differential treatment of African American[s].  Plaintiff's 56.1 Statement makes it clear that African Americans were treated differently than non-African Americans."  Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, pp. 12-13. This statement ignores Market's burden under the law.  The fact that *some* African-Americans were treated differently than *some* non-African-Americans does not mean that *Market* was treated *less favorably* than non-African employees who were *similarly situated* to her, which is the relevant inquiry under Title VII.

Although she has not clarified the point, Market's argument on this element of the prima facie case would seem to spring from

23

her allegations that Czerwinski denied her the opportunity to work overtime, while allowing other Maintenance Administrators to do so.[2] At her deposition, Market claimed that, when she returned from her first leave of absence in August of 2000, Czerwinski denied her overtime, while allowing others to work overtime. First, as the Court has explained, the evidence belies Market's claim that she was not permitted to work overtime during this period; the overtime records show that she worked 10.25 hours of overtime in August and September of 2000, and Market admitted at her deposition that she had worked this overtime. *See* Market Dep., pp. 348-49; Market Deposition Exhibit 7. The record also contains overtime records for four other Maintenance Administrators, Sue Valena, Shirley Beach, Paula Carillo, and Doris Elder, showing that they each worked a small amount of overtime during the first quarter of 2001. But this evidence alone does not make Market's case. Putting aside Doris Elder, who is African-American, Market would still have to show that she, Valena, Beach and Carillo were similarly situated, and she has not done so.

---

[2]The various grievances in the record contain a wide variety of allegations about the alleged disparity in treatment of African-American and non-African American employees at the Hi-Cap Center. But Market has given the Court no reason to think that these allegations, asserted in grievances filed on behalf of others, bear on her discrimination claim. Certainly, Market has provided no basis for the Court to conclude that any of the employees allegedly treated better than the other groups of people were "similarly situated" to her.

24

The Seventh Circuit has interpreted "similarly situated" to mean "directly comparable . . . in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). "To determine whether two employees are directly comparable, a court looks at all the relevant factors, which most often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications." *Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)(citing *Patterson*, 281 F.3d at 680). Market has not addressed these issues, though the Court assumes that Valena, Beach, and Carillo all had the same job description and all reported to Czerwinski or Lasiewicz. The Court has no information concerning these employees' experience, education or other qualifications. But it is clear that Market differed from these employees in at least one material respect: she was a union steward, who was constantly butting heads with management over union issues and other perceived wrongs; more to the point, she was an aggressive and zealous union steward, filing more grievances than other stewards and even soliciting grievances from complacent employees. In this respect, her behavior and her position as union steward set her apart from the other Maintenance Administrators.

In sum, the Court finds that Market cannot establish a prima facie case of race discrimination, and Ameritech is, therefore, entitled to summary judgment on this claim.

   2.   Market's Retaliation Claim

A prima facie case of retaliation under Title VII similarly requires a plaintiff to show that she suffered some adverse employment action. Specifically, she must show "that (1) after lodging a complaint about discrimination, (2) only [she], and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) [she] was performing [her] job in a satisfactory manner." *See Johnson*, 325 F.3d at 897 (citing *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 642 (7th Cir. 2002); *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002)). For the most part, the adverse employment action evidence Market offers in support of her retaliation claim is the same adverse employment action evidence she offered in support of her race discrimination claim. Just as that evidence fell short of the mark above, it falls short of the mark here.

But Market's retaliation claim does appear to incorporate one additional allegation: she alleges that she was denied benefits under the company's Sickness & Accident Disability Plan in retaliation for filing this lawsuit. *See* Market Deposition, pp. 543-50. Ultimately, this claim goes nowhere, however,

because Market herself admitted that she received benefits under the Plan "[f]or the entire time I was ill." *Id.* at 552. At her deposition, she casually mentioned that she is still owed two days' pay. But that claim appears to have nothing to do with her sick leave; based on her deposition testimony about her various leaves of absence, the dates for which she claims she is still owed money occurred after she returned from sick leave and while she was out on leave for her mother's funeral. *See id.*, p. 554 (the relevant dates were December 17 and 18, 2001), pp. 46-47 (she was off on sick leave from March to October 2001 and was off for her mother's funeral in December). In short, Market cannot show that she suffered an adverse employment action, and the Court will, therefore, grant Ameritech's motion for summary judgment on Market's retaliation claim.

   3.   Market's Hostile Environment Claim

   Although Market did not specifically allege a hostile environment claim in her complaint, she argues that the nature of her allegations, i.e, the allegations of persistent racial slurs and name calling, demonstrates that such a claim is being alleged. To recover on a racially hostile work environment claim, a plaintiff must show that: (1) she was subject to unwelcome harassment; (2) the harassment was based on her race; (3) the harassment was sufficiently severe and pervasive that it altered the conditions of her environment and created a hostile

27

or abusive working environment; and (4) there is a basis for employer liability. *Mason v. Southern Illinois University at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000)(citing *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998)).

It would be an understatement to say that the first element listed above is disputed. Market alleges that she was subjected to unwelcome harassment in the form of almost daily epithets from her supervisors, Czerwinski and Lasiewicz; she also alleges that a co-worker called her a "dumb nigger" at least once, repeatedly called other employees "niggers" and "dumb niggers" and called her a "black bitch" "numerous, numerous times." Czerwinski and Lasiewicz vigorously deny that they ever called Market names, especially "bitch" or "black bitch." There seems to be no dispute about Fricilone's derogatory remarks, though, as the Court will explain later, his remarks alone would probably not be enough to satisfy the "severe or pervasive" elements. Thus, the case will likely live or die based upon whether the fact finder believes Market or whether the fact finder believes Czerwinski and Lasiewicz. But summary judgment is not the time to resolve such "he said, she said" disputes. *See Russell*, 243 F.3d at 340, 341. For now, the Court finds that issues of fact remain as to whether Market was, in fact, subjected to race-based harassment, as she alleges.

The Court next considers whether Market has demonstrated that, to the extent the harassment occurred, it occurred because of her race. Ameritech argues that, if Market was treated badly by management, it was because of her combative and confrontational personality, and not because of her race.[3] And there is a fair amount of support for this argument in the record. Even Market admits that Czerwinski's and Lasiewicz's nasty comments arose out of union matters. At her deposition, Market stated that Czerwinski "made nasty comments, called me a Black bitch" and said he was "sick of you, Black bitch" because she refused to stop soliciting grievances after he told her not to do so. Market Dep., pp. 385-86. She also stated that Lasiewicz "called me a bitch every time I mentioned union business to him, or any time I came to him for technicians who were not on line." Id. at 441. She later stated that Lasiewicz called her a bitch whenever he disagreed with her about a work matter or a grievance issue. Id. at 453. Similarly, she stated at her deposition that one time she was walking with Lucinda Williams, another co-worker, when Market went into Czerwinski's

---

[3]Ameritech made this same argument in connection with Market's discrimination and retaliation claims. It argued that, to the extent Market was treated worse than other employees, it was because of her personality and not because of her race. But because the Court found that Market's claim failed at the prima facie case stage, it did not address whether the evidence would show that this stated reason was merely a pretext for discrimination.

29

and Lasiewicz's cubicle to request an appointment to discuss a grievance, and, after she left, she and Williams heard Czerwinski tell Lasiewicz that he was "so sick of this Black bitch." *Id.* at 461.

The evidence also shows that Ameritech's description of Market as combative and confrontational is not inaccurate. At least during her tenure as a steward, Market was an in-your-face force to be reckoned with; indeed, she seemed to take great pride in that. At her deposition, she admitted that she filed more grievances than the other union stewards, even soliciting grievances from her co-workers and prodding them to file when they were not inclined to do so. Czerwinski submitted an affidavit in support of Ameritech's motion stating that, at grievance meetings, Market cursed and spoke in a belligerent manner. Affidavit of Robert Czerwinski, ¶¶9-10 (attached as Exhibit 1 to Ameritech's Motion for Summary Judgment). This is consistent with Market's testimony that she abided by "the equality rule" in grievance meetings, meaning that she felt she owed no deference or respect to supervisors in those meetings, and that she did not back down even when asked to do so. Market Deposition, pp. 367-73.

And it was not just Czerwinski who had issues with Market. Ameritech submitted deposition testimony and affidavits from various other Hi-Cap Center employees, some management, some non-

management, who agreed that Market's style and personality made
her tough to deal with sometimes. For example, Darlene Tunstall,
who is African-American, worked at Hi-Cap from 1998 to 2000, and
directly supervised Market during 1998 and 1999, said that Market
seemed to have a "chip on her shoulder" and that she "possessed a
combative, confrontational, and sometimes hostile style" in
dealing with her union steward responsibilities. Affidavit of
Darlene Tunstall, ¶¶11, 13. Earlean Burton, another African-
American female who worked at Hi-Cap from about 1990 to 2000 and
who served as a union steward during that time, stated that
Market "generated a lot of conflict," was confrontational and had
an "us (non-management/union) against them (management)
attitude." Affidavit of Earlean Burton, ¶¶7-8. And the record
contains many more examples of co-workers who seemed to think
that Market's harassment, if it occurred, was a function of her
personality and not her race.

But there is one glaring point in the record that suggests
the harassment had everything to do with race. If Market is to
be believed – something the jury will have to decide –
Czerwinski, Lasiewicz and Fricilone didn't just call her names;
they called her names that were either tinged with race ("**black**
bitch") or outright manifestations of racial animus ("nigger").
This alone would seem to be enough to create an issue of fact
about whether the harassment was race-based. *See Rodgers v.*

31

*Western-Southern Life Insurance Co.*, 12 F.3d 668, 675 (7th Cir.
1993)(the word "nigger" is an unambiguously racial epithet);
*Bailey v. Binyon*, 583 F.Supp. 923, 927-28 (N.D. Ill. 1984)(it is
impossible to regard the term "nigger" as anything but
discrimination based on race).

Next, the Court considers whether the alleged harassment was
sufficiently severe or pervasive to be actionable.  To
demonstrate harassment that rises to the level of a statutory
violation, Market must prove that "her work environment was both
subjectively and objectively offensive; 'one that a reasonable
person would find hostile or abusive, and one that the victim in
fact did perceive to be so.'" *Cerros v. Steel Technologies, Inc.*,
288 F.3d 1040, 1045 (7th Cir. 2002)(quoting *Gentry v. Express
Packaging Co.*, 238 F.3d 842, 850 (7th Cir. 2001); *Faragher v.
City of Boca Raton*, 524 U.S. 775, 787 (1998)).  In deciding
whether a given work environment is hostile or abusive, the Court
"must consider the totality of the circumstances, including the
'frequency of the discriminatory conduct; its severity; whether
it is physically threatening or humiliating, or a mere offensive
utterance; and whether it unreasonably interferes with an
employee's work performance.'" *Cerros*, 288 F.3d at 1046 (quoting
*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).

Taking the facts in the light most favorable to Market, *see
Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), on an

32

almost daily basis from May 2000 to at least August 2000,
Czerwinski and Lasiewicz called Market a "bitch" or a "black
bitch," and Czerwinski repeatedly referred to African-American
male employees as "crackheads." Additionally, Joe Fricilone, a
co-worker who Market perceived – rightly or wrongly – to have
some input in disciplinary matters, once called her a "dumb
nigger," repeatedly called other African-American employees
"niggers" or "dumb niggers," and called her a "black bitch"
"numerous, numerous times." Although the epithets directed at
other employees weigh less heavily in the analysis, *see, e.g.,*
*Russell v. Board of Trustees of the University of Illinois at*
*Chicago*, 243 F.3d 336, 343 (7th Cir. 2001), on the whole, there
is little question that a reasonable person would find this
persistent barrage of epithets (if it occurred) to be hostile and
abusive. It is bad enough to think about an employee being
called such names by her supervisors once or twice; it is far
worse to imagine enduring this behavior each and every workday
for a period of several months. Even taking into account that
Market was off work for part of the time, that is still a lot of
name calling. The sheer pervasiveness of the alleged harassment,
coupled with the racial nature of the chosen epithets, is likely
enough to satisfy the objective part of the test.

The Court next considers whether Market actually found the
environment at the Hi-Cap Center to be hostile or abusive; that

is, whether the environment was subjectively hostile or abusive. There is some evidence to suggest that Market did not. At her deposition, she stated that she told Lucinda Williams that Czerwinski's repeated "bitch" and "black bitch" remarks "did not bother me." Market Dep., p. 462. And, at least with respect to Fricilone's comments, there is no evidence to establish that the behavior impacted Market's ability to do her job. But the record does contain evidence from which a jury could reasonably find that Czerwinski's animosity and constant insults impacted the way in which Market performed her job. For starters, the record shows that Market was out of work for two months in the summer of 2000 and for most of 2001, and that she was paid for it. This would certainly seem to show that someone in the medical community found Market to be incapable of performing her job during that time. And, at least during the first leave of absence, a jury could reasonably find, based on Market's testimony, which is admittedly self-serving, that the stress inflicted upon her as a result of the alleged harassment at the Hi-Cap Center played some role in her incapacitation.

Finally, assuming that the alleged harassment actually occurred, the Court considers whether the circumstances of the case provide any basis to hold Ameritech liable for that harassment. Because Market alleges that the hostile environment was created by her supervisors (primarily Czerwinski and

Lasiewicz), Ameritech is essentially strictly liable for the discriminatory conduct. *See Mason*, 233 F.3d at 1043 (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)). But where, as here, "no tangible employment action is taken,[4] a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence . . . ." *Faragher*, 524 U.S. at 807. To avoid liability for hostile environment harassment by a supervisor, an employer must show: "(a) that [it] exercised reasonable care to prevent and correct promptly any [] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

Ameritech seeks to establish the first element of its affirmative defense by noting that it took swift and decisive action to remove Czerwinski from Market's life after she complained about the alleged harassment. Under Ameritech's version of events, Market first complained about Czerwinski's behavior to Tom Brocious, the director of the Hi-Cap Center, in August or September of 2000; James Hsu, the company's internal

---

[4]Examples of "tangible employment actions" include "a discharge, demotion, or undesirable reassignment," *see Faragher*, 524 U.S. at 808; *Ellerth*, 524 U.S. at 762-63, none of which, as the Court explained above, happened here.

35

EEO officer, met with Market on September 6, 2000, and Czerwinski was removed as Market's supervisor in October 2000. *See* Ameritech's Memorandum of Law in Support of its Motion for Summary Judgment, pp. 5-6. But, at her deposition, Market said that she complained to Brocious about Czerwinski's "bitch" and "black bitch" comments as early as May of 2000. Market Deposition, p. 463. Thus, if Market is to be believed (again, something the Court assumes at this stage), Ameritech actually waited five months before taking action to stop the harassment. Based on that evidence, a jury could reasonably find that the remedial action taken by Ameritech was less than swift, and that Ameritech failed to exercise reasonable care to correct promptly the alleged harassing behavior.

Based on the foregoing, the Court finds that issues of fact preclude the entry of summary judgment on Market's hostile environment claim. Specifically, the Court finds that issues of fact exist concerning whether Market was, in fact, harassed, and, if she was harassed, whether she was harassed because of her race or because of her combative and confrontational behavior on the job; issues of fact also exist concerning Market's subjective view of the environment and concerning Ameritech's affirmative defense to vicarious liability under *Faragher* and *Ellerth*.[5]

---

[5]Although the Court does not today specifically address Ameritech's potential liability for the alleged harassment committed by Fricilone, issues of fact may also exist on this

36

Should this claim proceed to trial, the Court will take great care to ensure that the trial is limited to these issues.

## CONCLUSION

For the reasons explained in this opinion, the Court grants Ameritech's motion for summary judgment with respect to Market's race discrimination and retaliation claims, but denies the motion with respect to Market's hostile environment claim. Additionally, the Court grants Ameritech's motion to strike in part; the Court strikes paragraphs 5-6, 16, 20-24, 29-31, 33, 36-44, 51-54, and 67 of Market's affidavit, and parts of paragraphs 8, 9, 12, 47, 58, 62, 65, and 68 of Market's affidavit.

DATED:  November 12, 2003

_Arlander Keys_
ARLANDER KEYS
United States Magistrate Judge

---

claim with respect to whether Fricilone had supervisory authority over Market.